**Opinion issued January 25, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00505-CR

_____

**XAVIER JOHNSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 278th District Court**
**Madison County, Texas[1]**
**Trial Court Case No. 18-12999**

---

[1] Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal from the Tenth Court of Appeals, which consolidated Johnson's two appeals, to this Court. *See* Misc. Docket No. 22–9050 (Tex. June 30, 2022); *see also* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases); TEX. R. APP. P. 41.3 ("In cases transferred by the Supreme Court from one court of appeals to another, the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court . . . .").

## MEMORANDUM OPINION

A jury convicted Appellant Xavier Johnson of the third-degree felony offenses of retaliation and assault on a public servant and assessed his punishment at ten and twenty years in prison, respectively. In four issues, Johnson argues (1) the evidence is legally insufficient to support his conviction for retaliation, (2) the evidence is legally insufficient to support his conviction for assault on a public servant, (3) the trial court erred in excluding evidence of the complainant's financial condition, and (4) the trial court erred in admitting an audiotape recording of the complainant.

Because we find there was legally sufficient evidence to support the convictions, and the trial court did not abuse its discretion with respect to the complained-of evidentiary rulings, we affirm the trial court's judgment.

## Background

Nicole Truelove worked as a literacy teacher in the Windham School District giving classes to inmates at the Texas Department of Corrections' Ferguson Prison Unit in Madison County, Texas, where Johnson was an inmate.[2, 3] She alleged that on November 13, 2017, soon after she started her class at the Ferguson Unit, she saw Johnson engaging in certain conduct and asked him to stop. Because Johnson did

---

[2]      Johnson was serving time for burglary of a habitation.

[3]      Ferguson is an all-male maximum security prison.

not cease his conduct, Truelove started writing a "disciplinary case" on Johnson for violating a classroom rule. According to Truelove, Johnson found out about the write up and, when class was dismissed, he grabbed Truelove's head by the hair, pulled her out of her chair, and slammed her head against the classroom door. Truelove alleged Johnson sexually assaulted her and threatened to harm her and her family.

Johnson was charged by indictment with aggravated sexual assault, retaliation, and assault on a public servant. Johnson pleaded not guilty. The jury acquitted Johnson of the aggravated sexual assault charge[4] and convicted him of the other two charges. The jury assessed Johnson's punishment at ten years and twenty years, respectively, for the retaliation and assault on a public servant charges.

## Evidentiary Rulings

Relevant to this appeal, the trial court made two evidentiary rulings outside the jury's presence.

### A. The Investigator's Audiotape

On November 13, 2017, Erin Fontenot was notified by Texas Department of Criminal Justice Captain Curtis Jordan that a teacher had been assaulted in the Ferguson Unit. Fontenot, an investigator for the Office of the Inspector General, walked down to the prison's education wing and recorded her initial interaction with

---

[4] The jury also acquitted Johnson of the lesser-included offense of sexual assault.

3

Truelove. During the ten-minute audio recording, Truelove is heard sobbing and stating repeatedly she wants to go home and wants someone to call her son. Fontenot recorded Truelove "[i]n case she said something that [Fontenot] would need to know for the investigation." Fontenot explained she did not "question [Truelove] about what happened at that time until at the time she was ready to talk," but she was recording "in case a name or something came up that we needed to know for our investigation."

Johnson argued that Fontenot's audiotape was inadmissible under Texas Rule of Evidence 403.[5] Johnson argued that several witnesses had already testified that Truelove was upset that morning, "sobbing hysterically," "upset, anxious and crying," "crying and hysterical" and "crying uncontrollably." Johnson argued the audio recording would be prejudicial because it would "confuse the issue and it's only intended to inflame the jury to have more sympathy for Ms. Truelove and it's already been established how upset she was." According to Johnson:

> [T]his tape will not add any, or very little probative value to whether or not this offense occurred. It's basically being shown to the jury with hitting them over the head with how horrible this experience was for her. It doesn't prove that the experience actually occurred. It just proves that she's crying and screaming, and my concern is it's going to mislead the jury. It's going to appeal to their emotions without adding

---

[5] Texas Rule of Evidence 403 allows a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403.

any factual evidence that's going to assist them in arriving at their decision, so I object to it's [sic] being admitted.

The State argued that the recording of Truelove was "obviously relevant to the offense" and was probative as to what happened on the day of the incident. The State argued that because one witness had attacked Truelove's character, the tape "became even more probative as to what actually transpired after that." The State continued, "considering the charges in the indictment, the imminence of the threat and how [Truelove] felt threatened, I think this helps corroborate that evidence, and so it doesn't appear to be a hearsay objection—I mean, it's clearly admissible."

The trial court overruled Johnson's objection and admitted Fontenot's audiotape into evidence.[6] Before the State published the recorded audiotape to the jury, Johnson re-urged his objection, and the trial court again overruled the objection.

## B.    The Financial Documents

During trial, Johnson sought to introduce evidence of a loan Truelove obtained and of her financial records showing, among other things, that her bank account was frequently overdrawn. Truelove had obtained a $10,000 loan as an advance on any potential future settlement or judgment resulting from a pending civil lawsuit Truelove had filed against the Texas Department of Criminal Justice

---

[6]    The trial court ordered that the admitted audiotape be "edited down to the point where they seem to exit the building and they have that rushing sound."

and the Windham School District in connection with Johnson's alleged assault. During the relevant offer of proof, Truelove testified she used the loan to pay for her living expenses.

Johnson argued that evidence of the loan was important because "it provides motive for [Truelove] continuing to pursue" the allegations against Johnson in that "one month after the incident, when she says she was so upset, she's on the courthouse steps telling everyone she's filing a lawsuit." The trial court allowed Johnson's counsel to admit evidence of Truelove's statements to the media concerning the filing of her civil lawsuit, but it held evidence of the loan was not admissible because it was "just too far afield."

Turning to the admissibility of Truelove's bank records, the trial court held it would not allow questioning about Truelove's finances or introduction of her bank records, "other than to say that she's got a lawsuit going, she's asking for money" and that she received worker's compensation benefits. The trial court judge stated he did not "care about her financial condition," adding that the fact Truelove was "getting [worker's compensation benefits] for an alleged injury on the job, to me, covers all that." The trial court stated that what Truelove "did with her money, or what she's spending her money on, I don't think is relevant to this particular Defendant on these particular allegations."

## The Trial

**A.      State's Witnesses**

**1.      Nicole Truelove**

Nicole Truelove was hired on October 2, 2017 by the Windham School District to teach in the Texas Department of Criminal Justice's ("TDCJ") Ferguson Unit in Madison County, Texas. The Ferguson Unit has an education wing with classrooms. In addition to Truelove, other teachers give classes to inmates in the prison's education wing. They are not correctional officers. Truelove testified she was teaching Literacy 1 and 2 to inmates who sought to earn a high school equivalency certificate.

The Ferguson Unit went on lock-down[7] around the same time Truelove began working at the prison. According to Truelove, the lock-down lasted about two weeks and, during that time, there was no classroom instruction. During the lock-down, she worked in her classroom, getting it ready for instruction. She attended a one-week training in the Ferguson Unit before she began to teach. Truelove testified she wore scrubs while teaching in the Ferguson Unit because she saw another teacher at the prison also wearing scrubs.

---

[7]      According to Ferguson Unit teacher Karen Bishop, lock-down is a two- to three-week period when the offenders are kept in their cells to allow security to look for contraband such as cell phones or weapons. Investigator Erin Fontenot testified that semi-annual lock-downs last for about two weeks. During lock-down, the unit is "thoroughly searched for any type of contraband or problems within the unit."

Immediately or soon after the lock-down ended, classes resumed at the prison. On the morning of November 13, 2017, Truelove began her class. She took attendance when the inmates arrived using a seating chart. Truelove started testing her students "to see where they were on reading with their literacy." Truelove sat on her stool by a class projector in the middle of the room or walked around the room.

During the class, Truelove saw Johnson "doing something" in violation of classroom rules and she told him to stop. Truelove asked Johnson to stop several times but he did not do so. As a result, Truelove decided to write a "disciplinary case" for Johnson. Truelove explained that when inmates fail to "follow the rules, [she] can't discipline them;" she instead writes "them a [disciplinary] case," which she testified is similar to a high school "office referral." After they are written, a discipline case, referred to as a "disciplinary," is given to the correctional officer in the prison's education unit.

Truelove wrote Johnson's name on the disciplinary. Another inmate got up to go to the bathroom and saw Johnson's disciplinary on Truelove's desk. According to Truelove, Johnson stopped the objectionable conduct only after he found out she was writing him a disciplinary. Truelove testified that Johnson asked if he could talk to her "about it outside," and she refused.

8

When class ended, the inmates were dismissed.  According to Truelove, she was seated in a chair behind her desk, "right beside the door."  "There was [] a lot of noise in the hallway, so [she] leaned over to . . . shut [her] door."  When she leaned over, she saw Johnson's face.  Truelove testified Johnson then "grabbed my head by my hair and pulled me out of my chair."  She continued, "[I]t hurt.  He yanked me up out of my chair and my legs were, you know, underneath my desk and in my chair, and I remember my shoe falling off somehow."  Johnson then, "slammed my head against the door, the back of the door.  He had shut the door.  He broke my glasses.  They fell to the ground."

Truelove testified Johnson pulled down her pants and underwear.  She testified "he was right up against" her and that she was "smashed up against the door."  Johnson then "jammed his fingers up [her vagina] really hard."  Truelove testified that Johnson told her,

> "If you fuck with me, I'll fuck with you," and he jammed me really hard, and then he didn't jam them, but then he said, "[I]f you fuck with me, I'll fuck with your husband," and he jammed them really hard all the way up, and then he said, "[I]f you fuck with me, I'll fuck with your fucking kids," and did it one more time, and then he let me go.

Truelove testified she thought Johnson was going to kill her.  When Johnson let go of her, Truelove slid down to her knees on the floor.  Afterward, Johnson grabbed a piece of paper from underneath Truelove's knees, which was the paper on which she had written the disciplinary.  He "wadded [the] piece of paper up" and

9

threw it into the trash. Johnson told her he was "going fucking home" and he left the classroom.

Truelove heard teacher Karen Bishop on the phone in the hallway of the education wing. Truelove, still on the ground, knocked on the door in her classroom to get Bishop's attention while "trying to get her pants and underwear up." Truelove testified she was trying to get out "from behind the door" and she just "wanted to get out of there." She was in shock and experiencing vaginal and head pain.

Following the alleged assault, a Ferguson Unit employee came into the classroom and told Truelove to sit down. The man "kept yelling at me to sit down, and then he was yelling at me who was that, who was it," but Truelove was "afraid to say [Johnson's] name[.]" She pointed to the trash can, telling him the disciplinary was in there. Someone else came into the classroom and covered her with a coat and she left the classroom. At that point, Truelove left the classroom and walked into the hallway. She kept walking until she felt she was outside. She sat down outside the fence.

According to Truelove, Erin Fontenot, an investigator for the Office of the Inspector General ("OIG"),[8] took her to Huntsville Memorial Hospital, where

---

[8] According to OIG investigator James Thrailkill, the OIG is the state police department that investigates crimes on state-owned property such as the TDCJ.

Truelove was given a physical exam by a Sexual Assault Nurse Examiner. Truelove gave a formal statement to Fontenot two or three days later.

Truelove testified she considered Johnson's words a threat "every day of [her] life since then, every single day." She stated that she moved after the alleged assault because she was afraid Johnson would "come after" her. She testified she was afraid to leave her house after the alleged assault. Truelove was scared of Johnson even though he was in prison because she did not know when he was getting out, whether he had family on the outside, or whether he would send someone to find her. She testified she moved across town because she was scared.

The jury heard a recording[9] of a news story featuring Truelove in front of the Harris County Courthouse giving a statement. Truelove was at the courthouse with her father, her brother, and her attorneys. In the news clip, Truelove read a letter she wrote to Governor Greg Abbott. She stated that she was upset because she was being told the TDCJ was going to cover up the alleged assault and she wanted something to be done about it. She was upset Johnson had not been arrested for the alleged assault. After she sent the letter to the Governor, charges were filed against Johnson. According to Truelove, it was her lawyer's idea for her to hold the press conference

---

[9] It is unclear from the record whether the jury was shown the videotaped recording of the news story or only the audiotaped version.

and read the letter. She testified she regretted having read that statement, which she wrote at her lawyers' request, because of how it later affected her family.

Truelove testified she filed a civil lawsuit in connection with Johnson's alleged assault and that the lawsuit was pending at the time of the trial. According to Truelove, the civil proceeding was on hold because "they need evidence from this trial to proceed, and they cannot get it right now."

Truelove testified she received worker's compensation benefits for two years following the alleged assault. She testified that the worker's compensation benefits she received did not cover the amount of her full salary. She believed Windham School District paid her the difference between her worker's compensation benefits and her full salary for a time.

### 2. Karen Bishop

Karen Bishop works for the Windham School District in the Ferguson Unit of the TDCJ. She testified she has worked for the district for 12 years. She teaches math and science for the high school equivalency program.

Bishop testified that November 13, 2017 was the first day after the lock-down at the Ferguson Unit ended. She testified that classes had been dismissed and she had just finished talking to the school's counselor on a hallway phone when she heard sobbing from Truelove's classroom. She did not see Truelove when she first looked toward Truelove's classroom but she continued to hear crying. Bishop saw

Truelove went she went to Truelove's classroom and leaned into the classroom's window.

Bishop saw Truelove behind the classroom door, bent at the waist. Bishop testified, "Her pants and panties were down around her knees.[10] I think her shoe was off." When she found her, Truelove "was sobbing, very—kind of hysterical." Bishop asked Truelove if she was okay and Truelove, sobbing, said something like, "he hurt me." Bishop called for Officer Morales, a correctional officer. After Bishop called Officer Morales, he came running down the hallway, looked in Truelove's room, and called for a female officer. The female officer, Shirley Cunningham, arrived and went into Truelove's room. Officer Cunningham helped Truelove get up and pull up her pants.

Bishop testified that the classroom windows are plexiglass, so if a door closes, it rattles the entire wall. She stated the doors are solid wood and there is an air condition exchange made of something like thin aluminum at the bottom of each door. Bishop testified she did not hear banging on the door or on the vent or any sound of a scuffle. She testified that the hallway was "pretty clear" by the time

---

[10] Bishop testified that when she looked through the window and first saw Truelove behind the classroom door, her pants and underwear were around her knees, but by the time Bishop got into the classroom, Truelove's pants and underwear were around her ankles. Bishop conceded, however, that she gave a statement the day of the alleged assault in which she stated she looked in the window and saw Truelove behind the classroom door with her underwear around her knees and her pants all the way down.

Truelove would have been banging on her classroom door. Bishop testified she did not see any signs of a scuffle. She stated that if a scuffle had occurred around Truelove's desk, where Truelove testified Johnson pulled her out from her desk by her hair and behind the door, "[i]t would have been visible, because the windows are right there." Bishop later conceded no one was standing by the classroom window when the alleged assault occurred, so no one would have seen if a scuffle occurred.

The jury was shown a surveillance video of the inmates leaving their classrooms on the day of the alleged incident. A person is seen walking out of Truelove's class after everyone else has been dismissed, and Bishop testified that she believed it was Johnson. The video shows Bishop on the phone. After she hung up, she heard Truelove's crying. The jury was shown a second video of the educational wing at the Ferguson Unit from a different angle.

Bishop testified that when the alleged incident occurred, she had been working with Truelove for about three or four weeks. When asked about her opinion concerning Truelove's "reputation for truthfulness," Bishop testified she "does not think [Truelove] is very truthful." For example, Truelove testified she was told by the principal not to remove students from the classroom if they break classroom rules, but Bishop testified the principal never told her not to remove students from class. Bishop also testified that inmates typically get angry when a disciplinary is

14

written on them and they try to get rid of the disciplinary by taking it with them, eating it, flushing it, or shredding it—not by merely throwing it in the garbage.

### 3.    Shirley Cunningham

Shirley Cunningham was a correctional officer with the TDCJ on November 13, 2017.  She monitored offenders at the Ferguson Unit.  She testified she had worked in the Ferguson Unit six or seven years prior to November 2017.  She worked in the Ferguson Unit's education department.

As they were dismissing the offenders from class on the day of the alleged assault, Bishop called to her to "come see what was going on.  She said she could hear something and she wanted me to go check it out, and when I went in the [class]room . . . the teacher [Truelove] was behind the door with her pants down and she was in a fetal position[.]"  Officer Cunningham asked Truelove who did it and "she was sort of like she didn't want to tell me, but I kept saying who done this, who done this and I was trying to get her pants up.  Her pants and her panties were down, and I helped her get up, and she was crying, she was hysterical[.]"

Officer Cunningham continued, "Well I was excited too, and I was saying who done this, who done this, who done this, and she did say the offender done it[.]"  Truelove "was hysterical, she was crying, and she did say who done it, after —after she told me about the [disciplinary] case she had wrote."  Officer Cunningham was

there when the disciplinary was found wadded up in the trash can. Johnson's name was written on the disciplinary.

Officer Cunningham did not witness the alleged assault or hear Johnson say threatening words to Truelove. She did not see papers on the floor when she entered the classroom.[11]

### 4. Julie Pickens

Julie Pickens is an advanced practice registered nurse. She testified that on November 13, 2017, she was working at Huntsville Memorial Hospital. She was a trauma program manager, an emergency room nurse, and a sexual assault nurse examiner ("SANE"). As part of her duties as a certified SANE, she examined people who were sexually assaulted.

According to Pickens, she conducted a SANE exam of Truelove on November 13, 2017. When Truelove arrived, "she was upset, she was anxious, she was crying. She was scared. She was in pain." She had a headache and vaginal pain. Pickens performed a SANE examination on Truelove and did not find any physical evidence of sexual assault.[12] According to Pickens, that was consistent with the events related by Truelove because there is often no evidence of a digitally penetrative sexual assault.

---

[11]     Photos of the classroom do not show papers strewn about on the floor.

[12]     Pickens testified she did not find any bruising on Truelove's body.

According to Pickens, Truelove told her that Johnson had his hands in his pants during class. Truelove told Pickens that Johnson possibly thought "she was looking at him and making a case or statement against him for having his hands in his pants[.]" Truelove told Pickens that after class, everyone left. Truelove finished her work and thought she heard something in the hall, so she went to the door. She saw nothing so she came back in and heard the door shut behind her. Truelove told Pickens that Johnson was behind the door and grabbed her by her hair, pushed her face against the door, and there was a scuffle. Truelove stated she lost her shoe and that Johnson had one hand over her mouth and was trying to get her pants down. Truelove heard her clothes tearing or stretching and "then he was inserting his fingers in her vagina, telling her if you 'f' with me, I'll 'f' with you. If you 'f' with me, I'll 'f' with your husband. If you 'f' with me, I'll 'f' with your kids. The whole time he was penetrating her with his fingers, and then he saw a piece of paper on the desk, wadded it up and threw it in the trash can and left, and she was trying to get attention to someone she heard on the phone and trying to get her clothes up and everyone else was walking in." As Truelove recounted this to Pickens, "[s]he was crying. She was upset, anger outbursts at times, very tearful, emotional, scared."

After performing a SANE examination on Truelove, Pickens performed a SANE examination on Johnson. Pickens testified it is common for law enforcement

17

to bring in sexual assault suspects to collect their DNA and to get their statement and side of the story.

Pickens testified that Johnson told her when he was brought in for a SANE exam that "they said [he] did something . . . and he said he didn't do anything." According to the statement Pickens took from Johnson, he said he had his hands in his pants because it was cold and everyone else did also. Other inmates told him Truelove wrote him up, so he asked Truelove if they could talk about it and Truelove told him to wait until after class. According to Pickens, Johnson told her, "After class she closed the door and had a piece of paper. She showed me and asked me if I see any rules that I had broken. I told her I didn't see any on that paper. Then she asked if I see any that I should follow. I told her I should follow all the rules, then she wadded up the paper and gave it to me to throw in the trash and I took it and threw it in the trash can."

### 5. Curtis Jordan

Curtis Jordan, a TDCJ Captain, was a Lieutenant at the Ferguson Unit on November 13, 2017. He heard a call for a supervisor to the Ferguson Unit education department. He was the first supervisor to arrive on the scene. Officer Jordan spoke to Officer Morales, who told him about "the incident that had possibly occurred." When Officer Jordan first arrived on the scene, he thought the incident could have resulted from a consensual relationship between Truelove and an inmate, which is

18

not allowed. As he spoke to other witnesses and observed Truelove, his opinion changed.

When Officer Jordan got to Truelove's classroom, he saw that "[s]he was visibly upset. She was crying. She had her face in her hands. She was saying that she wanted to go home." He asked Truelove questions, but she was "not really very responsive," so he spoke to another teacher in the hallway. Officer Jordan testified, "[B]ased on the information that was relayed to me, I assumed that it possibly could have been a sexual assault," so he notified his superior officer and investigators in the Ferguson Unit. Officer Jordan testified that Truelove "was crying uncontrollably . . . just to where she wouldn't even talk anymore, and she wouldn't respond to my questions."

Officer Jordan found the disciplinary crumpled up in the trash can. The disciplinary, which was crumpled up and admitted into evidence, contained the name Xavier Johnson and stated that Johnson "kept his hands in his pants and looked at ~~my~~ me the whole time." Officer Jordan compared the disciplinary to the classroom roster to get the inmate's number. He secured the disciplinary and gave it, together with the inmate's name and number, to Captain Tad Howard to "identify [Johnson] and get him restrained and separated from the population, so that way OIG could continue their investigation."

19

### 6. Tad Howard

Tad Howard is a Captain in the Ferguson Unit. He responded to a call on November 13, 2017 in the Ferguson Unit Education Department. He "was informed there may have been an assault on a staff member." Following the alleged assault, Officer Howard saw Truelove in the education wing and "she seemed very distraught and was crying."

Officer Howard was told an inmate named Xavier Johnson may have been involved. He placed Johnson in hand restraints as he came out of the Ferguson Unit Education Department and escorted him to the classification committee room.[13] Johnson did not resist when the restraints were put on him. He did not have the opportunity to wash his hands before the hand restraints were put on him.

After Johnson's clothes were collected and his hands were placed in bags, he was taken to Huntsville Memorial Hospital, where he gave DNA samples. Officer Howard stayed with Johnson throughout the entire process. At the hospital, Johnson "made the statement to the effect of did she say which hand I covered her mouth with." OIG Investigator James Thrailkill and Captain Wendall Wyatt were in the room with Officer Howard and Johnson at the time. After the evidence was collected from Johnson, he was returned to Ferguson.

---

[13] In the classification committee room, panels of prison employees address disciplinary issues, among other things.

## 7.     Erin Fontenot

Erin Fontenot is an investigator with the OIG.  She testified that OIG investigators "investigate any criminal or administrative issues that happen on TDCJ property."  On November 13, 2017, she was assigned to the Ferguson Unit, where she was one of three investigators.  The alleged assault occurred on the first day after a lock-down at the Ferguson Unit ended.  The OIG office received a call from Officer Jordan, who said "a teacher had been assaulted in the Education Department."  The investigators went to the education wing, spoke with Officer Jordan, and Fontenot went into the classroom with her audio recorder going.

When Fontenot entered the room, Truelove was "perched" in her chair near the desk.  "She was almost curled up in a ball as she could be, while sitting on that chair."  "She was crying, she was obviously upset and crying, stating that she wanted to leave, and she was covering herself with a jacket.  At that time her clothing had been pulled up back to where it normally should have been."  Fontenot was recording Truelove "[i]n case she said something that [Fontenot] would need to know for the investigation.  I wasn't going to question her about what happened at that time until at the time she was ready to talk, but in case a name or something came up that we needed to know for our investigation."

Truelove wanted to leave the prison.  She agreed to see a SANE.  As she left the building, she walked down the hall with a jacket over her head.  Fontenot took

Truelove to Huntsville Memorial Hospital to have a sexual assault exam. Truelove had trouble sitting in the front seat of Fontenot's car. The SANE exam lasted around three hours. After the exam, Truelove's father picked her up from the hospital.

Meanwhile, back at the prison, Johnson had been placed in the classification committee room and interviews were being conducted of other offenders and of staff. Almost eighty interviews were conducted for this case. Six or seven OIG investigators from across the region were called in to help with the investigation.

Fontenot interviewed Truelove on November 15, 2017, two days after the alleged assault. Fontenot already knew some of the details of the alleged assault because Truelove permitted Pickens to share with Fontenot what Truelove told her during the SANE exam. After her investigation, Fontenot obtained a warrant against Johnson for aggravated sexual assault, for which she believed she had probable cause. The probable cause affidavit executed by Fontenot referred to Truelove's "torn clothing." Fontenot explained that the elastic in Truelove's underwear had been broken.

Photos of the classroom after the alleged assault show a bobby pin and hairs around it on the floor by the door in the classroom. Fontenot testified that inmates in the Ferguson Unit are not allowed to have bobby pins. Fontenot could not say with absolute certainty where the bobby pin came from or whether it had any relationship to the alleged assault. She believed two hairs were collected with the

22

bobby pins. Truelove told Fontenot she had bobby pins in her hair the day of the alleged assault. Fontenot obtained a hair sample from Truelove. The bobby pin had dust bunnies. She conceded Truelove would not likely wear a bobby pin with dust bunnies.

The arrest warrant for Johnson was signed on December 16, 2017, two days after Truelove's press conference. Fontenot believes the probable cause affidavit was signed the same day. She testified that the OIG and Department of Public Safety ("DPS") were pressured by the Governor's office to get the case moving.

### 8. Devin Crago

Devin Crago is a section supervisor of the Houston DPS Regional Crime Lab. She was a forensic scientist in the trace evidence section when she wrote a report regarding two hairs that were submitted from the scene of Truelove's alleged assault. One of the hairs was "microscopically similar" to the hairs collected from Truelove and the hair's root characteristic "gave an indication of having been forcibly removed." The other hair also was microscopically similar to Truelove's hair sample but had fewer features for comparison. She testified that hair can be forcibly removed by ways other than being pulled out— for example, by normal use of a hairbrush.

### 9. Jessica Ehmann

Jessica Ehmann is a supervisor and forensic analyst in the DNA section at the Houston DPS crime laboratory. She testified that she analyzed the DNA in the two hairs and found they were consistent with Truelove's DNA. She testified there is no DNA that connects Johnson to the alleged assault. According to Ehmann, using autosomal DNA testing, no male DNA was detected in Truelove's vaginal swab or mouth swab, or from the swab of Truelove's underwear. Using a more sensitive DNA profile called YSTR, however, Ehmann found a small amount of male genetic material in the mouth swab, but it was impossible to tell whether it came from one person or multiple people. Also, there was male DNA from at least two males on the swab of the underwear but it could not be identified. Ehmann testified that in digital penetration cases, analysts frequently do not find DNA of someone other than the victim.

Ehmann testified that Johnson's DNA samples included swabs from his hands, fingers, fingernails, pants, and boxer shorts. The DNA swab of Johnson's hands was uninterpretable because it came back as a mixture of more than four individuals.

### 10. James Thrailkill

James Thrailkill is an OIG investigator. He testified that on November 13, 2017, he was working at the Ferguson Unit when he received a report of an assault

in the Education Department. He and his two coworkers[14] responded. When they arrived, he saw one of the teachers in the classroom "kind of crouched down in the corner against the wall" and Fontenot entered the room. Officer Thrailkill collected Johnson's clothes in the classification committee room, put them in evidence bags, and bagged Johnson's hands. He went with Johnson to the evidence collection by the SANE at the hospital.

## B. Defense Witnesses

### 1. Cleburne Swilley

Cleburne Swilley is Truelove's ex-husband. He testified that Truelove is not truthful. He stated he knew nothing about the alleged assault on November 13, 2017.

### 2. Carline Swilley

Carline Swilley is a retired Harris County Sheriff's Department deputy. Cleburne Swilley is her son. She testified Truelove was married to her son, Cleburne. She testified that Truelove is not a truthful person. Carline knew nothing about the alleged assault on November 13, 2017.

### 3. Matt Quartaro

Matt Quartaro is a self-employed DNA analyst. His company helps attorneys understand DNA results and determines whether the testing was done according to

---

[14] Christopher James, Thrailkill and Fontenot were the three OIG investigators at Ferguson.

generally accepted guidelines in the community.

Quartaro testified that autosomal DNA analysis, which is performed in most cases, does not separate male and female DNA. YSTR testing is specific for male DNA—it helps to see if the male who might have left DNA in a sample can be identified. The YSTR analysis detected no male DNA on Truelove's vaginal swabs, found it was uninterpretable from the mouth swabs and found a partial YSTR profile on the underwear, which meant they could not detect all the DNA material there. It appeared to be a mixture of two males, but they could not tell who left the DNA behind.

According to Quartaro, no YSTR testing links Johnson to Truelove. Johnson's DNA analysis was inconclusive because it was impossible to identify the number of contributors to the samples. At least four individuals donated DNA to the sample analyzed from Johnson's hands and fingers. No DNA could be recovered for analysis from under Johnson's fingernails.

Quartaro testified about a 2011 study concerning DNA on fingernail scrapings after digital penetration. In the study, in every sample tested, DNA transferred from the vagina under the fingernails during digital penetration. In a case of digital penetration, he would have expected "that DNA would transfer." According to Quartaro, the act of digitally penetrating someone "should leave a fair amount of epithelial cells on the hands, and in the absence of removing those, they should stay

26

there until they degrade or they are removed." Even if Johnson licked his fingers after the alleged assault, Quartaro would expect some of Truelove's DNA to be detectable, either under the fingernails or on the fingers. Quartaro stated, "[I]f there was digital penetration, there would be a good amount of DNA transferred, and based on the studies that I've looked at, it should persist for several hours." However, he acknowledged that DNA from the perpetrator's fingers would not necessarily be recovered in every case of digital penetration. He testified that the DNA testing was done "pretty well."

Quartaro conceded that it is possible during the three-and-a-half hours between the alleged assault and the time Johnson's hands were bagged that there was a DNA transfer. After watching part of one of the videos admitted into evidence, Quartaro testified it looked like Johnson was "biting his fingernails" after the alleged assault.

### 4. Donald Manry

Donald Manry, a private investigator, testified that some of the investigators used leading questions when they interviewed Truelove.[15] He testified he saw no sign of the waistband being torn from Truelove's underwear or of loose elastic on the waistband. It was concerning to him that Fontenot's report did not include

---

[15] Manry testified that Fontenot's leading questions were not about how the assault allegedly occurred or who committed it.

information about the bobby pins and he stated that it is not normal for a victim in this type of offense to go to the media so soon after the alleged assault. Manry testified that Truelove's statements about whether she was sitting or standing at her desk when the alleged assault occurred were inconsistent.

According to Manry, when a classroom door in the education wing is closed, it shakes the classroom's plexiglass windows. He testified that if someone slumped down behind the door and yelled, the sound would have traveled through the vent at the bottom of the door and reverberated down the hallway in the Ferguson Unit. He stated that Truelove's testimony that she was yelling and beating on the classroom door "just is not consistent with Ms. Bishop being right there."

Manry was shown a surveillance video of the educational wing at the Ferguson Unit taped on the day of the alleged assault. Johnson is seen walking out the classroom in the video. Manry testified that Johnson did not close the door after walking out, which is inconsistent with typical criminal behavior to try to conceal an act. Manry explained that later in the surveillance video you can see the classroom door closed for the first time "because you see the door knob pop out just a little bit . . . ." By contrast, Manry testified that you do not see the doorknob in the video when Johnson is in the classroom with Truelove. According to Manry, had Truelove been grabbed by the hair and thrown forcefully into the door as she testified, the doorknob of the classroom would have been visible. Manry

28

acknowledged, however, that it is not uncommon for a complainant to get small details wrong when later recalling the event. He agreed that it happens "pretty frequently" that little details are off.

## Sufficiency of the Evidence

In his first and second issues, Johnson contends the evidence was insufficient to support the judgment of conviction for the offense of retaliation and for the offense of assault on a public servant.

### A. Standard of Review

We review a challenge to the sufficiency of the evidence under the standard adopted in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Pursuant to *Jackson*, we "consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *see Jackson*, 443 U.S. at 319. Under this standard, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "the standard of review on appeal is the same for both direct and circumstantial evidence cases." *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex.

29

Crim. App. 2010) (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

In our review, we give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *See Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We presume the fact finder resolved any conflicts in the evidence in favor of the verdict and defer to that resolution, as long as the resolution is rational. *See Jackson*, 443 U.S. at 326.

Our review of the record includes all introduced evidence, whether properly or improperly admitted. *See Winfrey*, 393 S.W.3d at 767 (stating courts consider admissible and inadmissible evidence presented at trial when conducting sufficiency analysis). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

## B. Conviction for Retaliation

A person commits the offense of retaliation "if the person intentionally or knowingly harms or threatens to harm another by an unlawful act . . . in retaliation for or on account of the service or status of another as a . . . public servant, witness, prospective witness, or informant[.]" TEX. PENAL CODE § 36.06(a)(1)(A). The indictment against Johnson alleged that Johnson harmed Truelove by "us[ing] his

hand to pull the hair of [Truelove], and cause her bodily injury, in retaliation for or on account of the status of [Truelove] as a prospective witness." *See* TEX. PENAL CODE § 36.06(a)(1)(A).

Johnson argues "the State failed to prove beyond a reasonable doubt that the harm inflicted upon Truelove resulted from a retributive attack for duties already performed." He argues that at the time of the alleged assault, Truelove had merely begun the process of drafting her disciplinary against Johnson and had yet to submit it to any prison staff. According to Johnson, because the disciplinary was incomplete, "the State failed to prove that [he] attacked Truelove in retribution (retaliation) for or on account of her service or status as a prospective witness." He concludes that because Truelove had not written the disciplinary, she was not a "prospective witness" as that term is defined in the Penal Code.

The State disagrees, arguing that the only reason the disciplinary was incomplete was because Johnson's assault prevented Truelove from completing it. The State argues that but for Johnson's attack, Truelove would have been able to complete the disciplinary and submit it to the correctional staff. Given that Johnson is the "sole reason" Truelove's duty with respect to the disciplinary was not completed, the State argues, Johnson "cannot now claim that Truelove was not a prospective witness within the meaning of the statute. It is his criminal actions that prevented the completion of the process." We agree.

31

One of the retaliation statute's central purposes "is to encourage a specified class of citizens—which includes public servants, witnesses, prospective witnesses, and informants—to perform vital public duties without fear of retribution." *Cada v. State*, 334 S.W.3d 766, 771 (Tex. Crim. App. 2011). These public duties include "reporting criminal activities, testifying in official proceedings, or cooperating with the government in a criminal investigation." *Id.* (citing *Morrow v. State*, 862 S.W.2d 612, 615 (Tex. Crim. App. 1993); *see also Davis v. State*, No. AP-77,031, 2016 WL 6520209, at *12 (Tex. Crim. App. Nov. 2, 2016) (not designated for publication) ("A 'central purpose' of § 36.06 is to encourage public servants, witnesses, prospective witnesses, and informants to perform vital public duties, such as reporting criminal activities, testifying in official proceedings, and cooperating with the government in criminal investigations, without fear of harm or physical injury.") (citing *Cada*, 334 S.W.3d at 771).

The indictment for retaliation alleged Johnson harmed Truelove by "us[ing] his hand to pull the hair of [Truelove], and cause her bodily injury, in retaliation for or on account of the status of [Truelove] as a prospective witness." *See* TEX. PENAL CODE § 36.06(a)(1)(A). Although the Penal Code does not define "prospective witness," the Court of Criminal Appeals has held that a jury charge defining "prospective witness" as "a person who may testify in an official proceeding" is

proper. *Morrow*, 862 S.W.2d at 613.[16] The Court further held that "an official proceeding need not be initiated [] for a person to be a 'prospective witness' under section 36.06 of the Penal Code." *Id.* at 615; *see also Ortiz v. State*, 93 S.W.3d 79, 86 (Tex. Crim. App. 2002) ("[W]e have held that a 'prospective witness' is any 'person who may testify in an official proceeding.' Formal proceedings 'need not be initiated.'").

Johnson relies on *Riley v. State*, 965 S.W.2d 1 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) in support of his retaliation argument. In *Riley,* the appellant, a prison inmate, walked past the prison's central control desk. *Id.* at 1. A guard told the appellant to stop and return to the desk. *Id.* The appellant refused and continued to walk down the hall. *Id.* After another guard ("Freeman") ordered the appellant to stop several times, he attempted to block the appellant's way. *Id.* The appellant and Freeman became involved in a fight in which Freeman suffered multiple cuts to his face, twisted his ankle, and was knocked unconscious. *Id.* The appellant was convicted of retaliation and sentenced to twenty-five years in prison. *Id.* We reversed, holding it is not enough for the State to "demonstrate a public servant was

---

[16] When a term is not statutorily defined, we ascribe that term "its ordinary and usual meaning." *Hastings v. State*, 82 S.W.3d 493, 495 (Tex. App.—Austin 2002, pet. ref'd). "Prospective" is defined as "anticipated or expected; likely to come about." *Id.* (citing *Blacks Law Dictionary* 1238 (7th ed.) 1999). "Witness" is defined as "one who has testified in an official proceeding." *Hastings*, 82 S.W.3d at 495 (citing *Jones v. State,* 628 S.W.2d 51, 55 (Tex. Crim. App. 1980)).

33

harmed while lawfully discharging his official duties. It must prove the harm inflicted resulted from a retributive attack for duties already performed." *Id.* at 2. Sustaining the appellant's legal sufficiency challenge, we held there was no evidence supporting the retributory element.

Johnson's reliance on *Riley* is misplaced. Unlike in *Riley*, here there was a retributory element: the disciplinary. The jury heard evidence that Johnson was aware of the disciplinary when he pulled Truelove's hair and threatened her, her husband, and her children. Had Johnson not known about the disciplinary, but merely pulled Truelove's hair, the evidence might not support a retribution conviction. But the evidence indicates Johnson knew about the disciplinary when the alleged assault happened and that the disciplinary was the reason for the alleged attack, distinguishing this case from *Riley*.

We believe the Court of Criminal Appeals' opinion in *Morrow v. State* is more factually aligned with the facts of this case and thus instructive. In *Morrow*, a prison inmate ("Morrow") threw hot water in the face of another inmate who reported to prison authorities that Morrow was responsible for a broken skylight. 862 S.W.2d at 613. As he threw the hot water into the other inmate's face, Morrow allegedly said, "That will teach you to snitch." *Id.* The inmate sustained third-degree burns and Morrow was charged with retaliation. *Id.* Morrow was convicted of retaliation and the court of appeals affirmed. *Id.*

34

Morrow argued in the Court of Criminal Appeals that a prospective witness "must bear some relationship to an official proceeding that has actually been initiated," and because charges were never filed against Morrow for his alleged destruction of the skylight, the injured inmate was not a "prospective witness." *Id.* The Court disagreed, holding that "an official proceeding need not be initiated [] for a person to be a 'prospective witness' under section 36.06 of the Penal Code." *Id.* at 615.[17] The Court stated, "[T]o require the initiation of official proceedings in order for one to be a "prospective witness" would not further the apparent policies underlying section 36.06." *Id.* at 614. *See also Stewart v. State*, 137 S.W.3d 184, 187 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (holding official proceeding need not be initiated for one to be prospective witness) (citing *Morrow*, 862 S.W.2d at 615).

Johnson's argument in this case essentially mirrors that made by *Morrow*— that Truelove was not a prospective witness because the disciplinary was not

---

[17] At the time of Morrow's alleged offense, section 36.06 of the Texas Penal Code provided as follows:

> A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service of another as a public servant, witness, prospective witness, or informant.

*Morrow v. State*, 862 S.W.2d 612, 613 (Tex. Crim. App. 1993). Although the current version of section 36.06 has been expanded upon, section (a)(1) is virtually identical to the version in effect when *Morrow* was decided.

complete and thus no official proceeding was initiated. Johnson argues in his brief that he "attacked [Truelove] while she was still in the process of drafting her offense report," and thus, she had not yet written the disciplinary so she could not be a "prospective witness." As the State argues, allowing someone to circumvent a retaliation charge by injuring a prospective witness as he performs his duties thereby preventing the prospective witness from completing those duties would lead to an absurd result. It would also frustrate the statute's intent to encourage public servants to perform public duties without fear of retribution.

The evidence indicates the alleged assault was retaliatory. It is undisputed that Truelove was writing a disciplinary on Johnson. Truelove testified that Johnson found out about the disciplinary and asked to talk to her about it after class. After class, and before Truelove could complete the disciplinary, Truelove testified Johnson pulled her up from her chair by her hair and slammed her against the door, breaking her glasses.[18] She testified Johnson told her, "If you fuck with me, I'll fuck with you;" "[I]f you fuck with me, I'll fuck with your husband;" and "[I]f you fuck with me, I'll fuck with your fucking kids." Truelove testified that afterward, Johnson grabbed the paper on which she had written the disciplinary, wadded it up, and threw it into the trash. According to Truelove, Johnson then said he was "going

_____

[18]  The alleged assault in the retaliation charged occurred when Johnson pulled Truelove's hair. The alleged digital penetration is not part of the retaliation charge.

36

f[] home" and he left the room. The wadded-up disciplinary, which identified Johnson, was recovered and admitted into evidence.

Viewing the evidence in the light most favorable to the verdict, as we must, we hold a rational fact finder could have found beyond a reasonable doubt each element necessary to support the jury's finding that Johnson committed the charged offense of retaliation. We thus hold the evidence was legally sufficient to support the judgment of conviction for retaliation.

We overrule Johnson's first issue.

## C.    Conviction for Assault on a Public Servant

One commits the offense of assault if he "intentionally, knowingly, or recklessly causes bodily injury to another. . . ." TEX. PENAL CODE § 22.01(a)(1). An assault is a Class A misdemeanor, but the offense is elevated to a third-degree felony if committed against "a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant[.]" *Id.* § 22.01(b)(1).

Johnson's indictment for assault on a public servant stated that he injured Truelove by

> using his hands to pull the hair of [Truelove], and the defendant did then and there know that the complainant was then and there a public servant, to-wit: a teacher employed by the Windham Independent

School District,[19] and the complainant was then and there lawfully discharging an official duty to-wit: [Truelove] intended to submit a disciplinary complaint alleging said defendant had violated the rules for offenders incarcerated within the Texas Department of Criminal Justice.

(Footnote added). *See* TEX. PENAL CODE § 22.01(b)(1). Johnson argues Truelove cannot establish that Johnson knew about her status as a public servant because she "concealed" her protected status as a public school teacher given that she was wearing scrubs and merely proctored a literacy exam before the alleged assault occurred.[20] Johnson states:

> That morning she was wearing medical "scrubs," rather than the professional attire (i.e., business casual) of a classroom teacher. There is no evidence that she was wearing a badge (attached to her medical "scrubs" or attached to a lanyard hanging from her neck) identifying her employment as a teacher with the Windham School District and/or her connection with TDCJ. Moreover, there is no testimony that she struck the traditional pose of a classroom teacher–standing in front of chalkboard and lecturing—or offering individual instruction (tutoring) to an inmate struggling with the course material.

---

[19]  "The law is well settled in this state that an independent school district is an agency of the state." *Guin v. State*, 209 S.W.3d 682, 684 (Tex. App.—Texarkana 2006, no pet.) (citing *Barr v. Bernhard*, 562 S.W.2d 844, 846 (Tex. 1978)); *Powell v. State*, 549 S.W.2d 398, 400 (Tex. Crim. App. 1977) (holding school district is branch of government); *see also Moore v. State*, 143 S.W.3d 305, 311 (Tex. App.—Waco 2004, pet. ref'd) (holding school district superintendent was "public servant" under Section 1.07(a)(41)(A) of Texas Penal Code).

[20]  Johnson argues that at most, he should have been charged with misdemeanor assault, because there was no way he could have known Truelove was a public servant.

The Penal Code defines "public servant" as "a person . . . employed [as] . . . an officer, employee, or agent of government[.]"  TEX. PENAL CODE 1.07(a)(41)(A). It is well-settled that a teacher employed by a public school district is a public servant.  *See In re J.P.*, 136 S.W.3d 629, 630 (Tex. 2004) (noting that juvenile who hit and kicked public school teacher could have been charged, if an adult, with assault on public servant pursuant to Section 22.01(b)(1) of Penal Code); *In re B.M.*, 1 S.W.3d 204, 207 (Tex. App.—Tyler 1999, no pet.) ("Public servants, as defined by the Penal Code, include employees of independent school districts").  For a person to commit the offense of assault on a public servant, the defendant "must realize that he is assaulting a teacher, school district employee, police officer, or firefighter, but [he] does not have to know that teachers, school employees, police officers, or firefighters are defined by the penal code as public servants." *In re J.L. O.*, No. 03-01-00632-CV, 2002 WL 1804951, at *4 (Tex. App.—Austin Aug. 8, 2002, no pet.) (citing TEX. PENAL CODE § 8.03(a) (ignorance of law is no defense)).

Johnson has not cited, and we have not found, any case that holds a person must wear a school district identification badge or "business casual attire," stand in front of a chalkboard and lecture, or offer individual instruction to a student on a

given day to be identified as a public school teacher. The cases that Johnson cites do not support his argument.[21]

In *St. Amand v. State*, we held that explicit identification is not necessary under the statute. No. 01-11-00648-CR, 2013 WL 175705 (Tex. App.—Houston [1st Dist.] Jan. 17, 2013, pet. ref'd) (mem. op., not designated for publication). In that case, the appellant was convicted of assault on a public servant after hitting Dill, a "paraprofessional" at her son's school. *Id.* at \*1. The appellant and Dill had never met before the altercation during which the appellant punched Dill in the chest. *Id.* The appellant argued on appeal that the State had not satisfied its burden to establish she had knowledge that Dill was a public servant discharging an official duty

---

[21] Johnson cites several cases in which complainants, some of whom wore identification badges and uniforms, were found to be public servants. None of the cases cited indicate that *but for* the badge or manner of dress, the complainants would not have been found to be public servants. *See Ascencio v. State*, No. 11-06-00341-CR, 2008 WL 2133086, at \*2 (Tex. App.—Eastland May 22, 2008, no pet.) (mem. op, not designated for publication) (holding evidence was sufficient to support appellant's knowledge that nurse who wore a badge and medical scrubs each day and was distributing medication in prison was public servant); *Collins v. State*, No. 10-07-00222-CR, 2008 WL 2841008, at \*3 n.1 (Tex. App.—Waco July 23, 2008, pet. struck) (mem. op., not designated for publication) (noting that record established complainant who wore badge identifying her as TDCJ contract employee was public servant); *Carriere v. State*, 84 S.W.3d 753, 756–57 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (noting that uniformed officer told appellant he was police officer and holding that officer was public servant); *Easter v. State*, No. 13-95-055-CR, 1997 WL 33641957, at \*1 (Tex. App.—Corpus Christi–Edinburg Feb. 13, 1997, no pet.) (holding that, among other things, "the fact that the complainant was a correction officer in an officer's uniform, the fact that appellant knew the complainant was a guard and that she was in the cell block" supported conviction for retaliation against public servant).

because the evidence showed "Dill never identified herself as a public servant and was not wearing a badge or some other distinctive clothing or identification[.]" *Id.* at \*4. Affirming the conviction, we noted that the appellant had cited no authority, and we could not locate any, "indicating that such an explicit identification is required." *Id.*[22]

The evidence established that Truelove was hired by the Windham School District to provide literacy instruction to inmates at the TDCJ's Ferguson Unit. Truelove testified that classes are held in the education wing in the Ferguson Unit, where there are multiple classrooms. She testified that each class is taught by an assigned teacher, and the teachers are not correctional officers. Prior to the alleged assault, the inmates were seated in a classroom and Truelove was proctoring a literacy exam during a literacy class. During the class, Truelove sat at her stool by her projector or the podium and walked around the room. She took attendance and at some point, admonished Johnson for not following classroom rules. Truelove started writing a disciplinary on Johnson. Johnson asked permission to speak to her about it outside, but Truelove refused. When class was dismissed, Truelove was sitting at the teacher's desk. Truelove testified that she was wearing scrubs because during her training, she observed another teacher at the prison wearing scrubs.

---

[22] Although Johnson does not complain of jury charge error, he notes that the trial court did not instruct the jury that, as a matter of law, a teacher employed by the Windham School District is a public servant.

Viewing the evidence in the light most favorable to the verdict, as we must, we hold a rational fact finder could have found beyond a reasonable doubt that Johnson knew Truelove was a teacher when he assaulted her and thus that each element necessary to support the charged offense was established. We thus hold there was legally sufficient evidence to support the conviction for assault of a public servant.

We overrule Johnson's second issue.

## Evidentiary Challenges

In his third and fourth issues, Johnson contends the trial court erred by excluding evidence of the Truelove's financial condition and by admitting the audiotape Fontenot recorded of Truelove on the day of the alleged incident. For the reasons noted below, we overrule both issues.

## A.    Standard of Review

We review a trial court's decision to admit or exclude evidence using an abuse of discretion standard. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial judge abuses his discretion when his decision falls "outside the zone of reasonable disagreement." *Henley*, 493 S.W.3d at 83; *see also Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (stating trial court abuses discretion only if its decision

is "so clearly wrong as to lie outside the zone within which reasonable people might disagree").

Even if the trial court erred in admitting or excluding evidence, we will not reverse unless the appellant establishes harm. When constitutional error is implicated, "the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). For non-constitutional error, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b).[23]

## B. Evidence of Truelove's Financial Condition

In his third issue, Johnson argues the trial court abused its discretion in excluding evidence of Truelove's finances and of a loan she obtained against any potential future settlement or judgment in her civil lawsuit. He argues the trial court's refusal to allow cross-examination regarding Truelove's "financial condition—both as to her bank-account balance and as to a cash advance (loan) taken

---

[23] "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)).

43

against her [civil] lawsuit," which he refers to as "potential impeachment evidence," implicates his Sixth Amendment Confrontation Clause rights.[24]

### 1. Sixth Amendment Confrontation Clause

A defendant has a constitutional right to cross-examine witnesses. U.S. CONST. amends. VI, XIV; *see also Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). "[A]lthough a defendant's right to confrontation and cross-examination is constitutionally safeguarded, it is not absolute." *Cruz–Escalante v. State*, 491 S.W.3d 857, 860 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Van Arsdall*, 475 U.S. at 678–79). While a defendant may cross-examine a witness "on any subject reasonably calculated to attack his credibility, such as exposing a motive, bias or interest," the trial court has "considerable discretion in determining how and when bias may be proved, and what collateral evidence is material for that purpose." *Cruz–Escalante*, 491 S.W.3d at 860 (citing *Recer v. State*, 821 S.W.2d 715, 717 (Tex. App.—Houston [14th Dist.] 1991, no pet.)).

While the motivation of a testifying witness "is of particular relevance," a "trial court retains wide latitude to impose reasonable limits on such cross examination without violating the Confrontation Clause." *Tucker v. State*, 771

---

[24] Johnson does not argue that the trial court erred in disallowing extended cross-examination regarding Truelove's civil lawsuit. Rather, Johnson complains of the trial court's ruling "to restrict Johnson's cross-examination of Truelove regarding her dire financial condition."

S.W.2d 523, 531 (Tex. Crim. App. 1988) (citing *Van Arsdall*, 475 U.S. at 679).[25]

"[T]he trial court has broad discretion to impose reasonable limits on cross-examination without running afoul of the Confrontation Clause in order to avoid harassment, prejudice, confusion of the issues, endangering the witness, or the injection of cumulative, collateral, or marginally relevant evidence." *Moran v. State*, 350 S.W.3d 240, 247 (Tex. App.—San Antonio 2011, no pet.) (citing *Van Arsdall*, 475 U.S. at 679); *see also Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998) ("For the evidence to be admissible, the proponent must establish some causal connection or logical relationship between the pending charges and the witness' . . . potential bias or prejudice for the State[.]").

## 2. Truelove's Cash Advance

In seeking admission of testimony and documents concerning the cash advance payment (loan) Truelove received for her civil suit, Johnson argued to the trial court that the loan "provide[d] motive" for Truelove to continue pursuing her allegations against Johnson "because I think all of this is relative to the [civil]

---

[25] Johnson relies on *Castillo v. State*, 939 S.W.2d 754, 758 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd), noting that the trial court held that evidence of a police officer's financial interest in making a DWI arrest was relevant. But the appellate court held in *Castillo* that the trial court did not abuse its discretion in *excluding* evidence of the officer's pay because "his decision to make allegedly 'marginal' arrests [wa]s too attenuated from any potential financial gain to overcome the risk of confusion of the issues, embarrassment, harassment, and undue delay." *Id.* at 759.

45

lawsuit, the fact that one month after the incident, when she says she was so upset, she's on the courthouse steps telling everybody she's filing a lawsuit."

The trial court at first held Johnson could discuss "the fact she got a loan," explaining:

> I'll allow that, but you know, I'm going to cut this off short if it gets too far afield, so the fact that she may have gotten some advance is fine with me, or I'm going to allow that testimony, but I'm not going to allow any documents or anything like that in, so she can testify that she received an advance on the litigation and that amount, and what she just testified she used it for.

But after further argument and learning Truelove was not required to pay back the loan even if she did not prevail in her civil suit, the trial court disallowed evidence of the loan.[26] The trial court explained it had allowed admission of evidence concerning Truelove's worker's compensation benefits because the State had opened the door, but that it would not allow counsel to "get into the loan, because that's just too far afield." The trial court held:

> I don't care about her financial condition. The fact that she's getting money for an alleged injury on the job, to me, covers all that. What she did with her money, or what she's spending her money on, I don't think is relevant to this particular Defendant on these particular allegations.

---

[26] During the offer of proof, Truelove testified outside the presence of the jury that she received a $10,000 "loan" in connection with her civil lawsuit. But as Truelove testified, the money was an advance on any future settlement or judgment in the civil lawsuit, rather than a loan. Truelove testified she did not have to pay back the money, regardless of whether she prevailed in her civil lawsuit.

The trial court thus permitted Johnson to cross-examine Truelove about her pending civil lawsuit but it denied admissibility of any documents or inquiry concerning the cash advance loan Truelove received from her civil lawsuit.

In light of the admitted testimony regarding Truelove's pending civil litigation and Truelove's testimony that she would not have to repay the advance, we conclude the trial court was within its discretion in excluding cross-examination about Truelove's loan. *See Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000) (noting trial court has "broad discretion" to reasonably limit cross-examination "to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence").

We overrule Johnson's third issue.

### 3.    Truelove's Bank Account

Johnson also complains of the trial court's exclusion of testimony regarding Truelove's financial condition.  Johnson argues that Truelove "was cash-strapped and desperately needed the jury to convict Johnson of the crimes for which he was on trial in order to shore up the claims in her [civil] lawsuit against the prison system."  According to Johnson, the trial court's ruling disallowing him to question Truelove about her financial condition violated his right to confrontation under the Sixth Amendment because Truelove is a "financial opportunist" and the excluded evidence would have shown she was "in desperate financial straits."

But the record does not reveal that the trial court disallowed Johnson to question Truelove generally about her "financial condition." The trial court allowed Johnson to question Truelove about her worker's compensation benefits and a second job she had with a skin care company.[27] Johnson asked Truelove about the amount and timing of her worker's compensation benefits and payments from Windham School District after she left her teaching job there. Johnson also asked Truelove about her employment status.

The jury also learned during the trial about Truelove's pending civil lawsuit against TDCJ and the Windham School District. The trial court permitted Johnson to ask Truelove about her civil lawsuit and also allowed introduction of a statement Truelove made from the courthouse steps to the media requesting that charges be filed against Johnson. Although the trial court did not allow the admission of Truelove's letter to Governor Abbott, the trial court allowed Johnson to question Truelove about the substance of the letter. Johnson was also able to question Truelove about her civil suit, and the jury heard Truelove testify that her civil case was "on hold" and "not moving forward" until after the criminal trial was over.

We thus do not agree that the trial court disallowed Johnson to cross-examine Truelove generally about her financial condition. Rather, the court excluded

---

[27] Truelove testified that she did not recall whether she was still employed with the skin care company while she was receiving worker's compensation benefits.

48

Truelove's bank records, as well as testimony concerning such records, including the alleged fact Truelove was "overdrawn."[28] The trial court denied admission of the bank records and related testimony, stating that what Truelove "did with her money, or what she's spending her money on, I don't think is relevant" to Johnson "on these particular allegations."

In light of the admitted evidence, the jury could have inferred it would be in Truelove's best interest with respect to the civil lawsuit if Johnson was convicted in the criminal lawsuit. Indeed, during Johnson's closing, his counsel said as much. Reminding the jury that Truelove's civil case was "on hold" pending the outcome of the criminal case, Johnson's counsel argued, "I take that to mean whatever happens today will affect whether or not she gets money in her civil lawsuit."

We are not bound or persuaded by the Illinois appellate case Johnson cites for the proposition that a trial court should allow a defendant to explore a witness' financial condition on cross-examination in a criminal trial without bounds. In that case, *People v. Greer*, 689 N.E.2d 134 (Ill. App. 1997), testimony revealed that the state helped a witness move from the neighborhood where a murder occurred by

---

[28] Johnson does not specifically complain of the trial court's exclusion of Johnson's banking documents. Nor did Johnson make an offer of proof discussing the contents of the boxes containing the alleged bank documents or what would have been elicited from the documents. *See* TEX. R. EVID. 103(a)(2) ("A party may claim error in a ruling to . . . exclude evidence only if the error affects a substantial right of the party and . . . a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.").

getting him a moving van and paying for his stay in a hotel during the move. *Id.* at 135. Holding that the issue was "collateral," the trial court stopped the defense from cross-examining the witness on "the depth of his financial distress and the extent of his desire to move from the neighborhood in which the crime occurred." *Id.* at 136. The defense hoped the evidence would establish that the help the witness received had induced him to implicate the defendant. *Id.* The defense unsuccessfully attempted to elicit testimony to show the witness was biased toward the State because he had wanted to move for some time but could not do so for financial reasons, and he had not paid real estate taxes for two years. *Id.* The defendant was convicted.

On appeal, the Illinois Court of Appeals held the trial court erred in disallowing cross-examination that would have allowed the defendant to develop a theory of impeachment—that "the help [the witness] received from the State was sufficient to induce him to implicate the defendant in the victim's death." *Id.* The appellate court noted that evidence the witness was behind in his taxes and that he had wanted to leave the neighborhood for years but had been unable to afford a move was not collateral to whether the witness would testify falsely to obtain help moving. *Id.*

50

Unlike in *Greer*, there was no argument in this case that the State provided financial motivation for Truelove to testify against Johnson.[29] Moreover, Truelove's bank records and the corresponding testimony Johnson sought to elicit—that Truelove's bank account had been overdrawn—was collateral and further cumulative, given that the jury already knew Truelove stood to benefit financially if her civil action was successful. And as the State further notes, Johnson did not argue that Truelove "ever had financial troubles *prior* to her assault and consequently her inability to work." (Emphasis in original.)[30]

Given the "wide latitude" the trial court has in determining whether to admit testimony to prove bias, we hold the trial court did not abuse its discretion in refusing

---

[29] *Greer* also appears to be limited to certain facts not present here: "According to the Illinois Supreme Court, *when the defense theory is that the defendant has been framed* and the witness who led the police to the defendant has a motive to testify falsely, the evidence to show that motive is 'hardly collateral.'" *People v. Greer*, 689 N.E.2d 134, 136 (Ill. App. 1997) (emphasis added) (citing *People v. Gonzalez*, 472 N.E.2d 417, 420 (Ill. 1984)).

[30] Johnson's reliance on *McDaniel v. State*, 3 S.W.3d 176 (Tex. App.—Fort Worth 1999, pet. ref'd), also is misplaced. In *McDaniel*, the court of appeals held the defendant in a forgery case should have been allowed to cross-examine her ex-husband, the State's only witness, about an outstanding child support arrearage judgment in her favor, which the defense contended gave him "a reason to slant his testimony and to say things that are not true to get back at [the defendant] because she's the one that has the judgment against him." *Id.* at 179. The appellate court held that the State's case would have been "weakened considerably" if the jury had been told of the child support arrearage judgment. *Id.* at 182. In the present case, the jury heard testimony regarding the pending civil lawsuit from which Truelove stood to gain if she prevailed. Thus, we do not find the State's case would have been weakened by learning Truelove's bank account had been overdrawn or learning about an advance payment Truelove was not required to pay back.

51

to allow testimony about Truelove's bank account or the fact she had been overdrawn. *See Lopez*, 18 S.W.3d at 222 (noting trial court's "broad discretion" to limit cross-examination without running afoul of defendant's Sixth Amendment rights).

We overrule Johnson's third issue.

## C.  Admission of Audiotaped Recording

In his fourth issue, Johnson argues the trial court erred in admitting a ten-minute audio recording of Truelove recorded by Fontenot on the day of the alleged assault.  In the ten-minute audio recording, Truelove is heard sobbing and stating repeatedly that she wants to go home, she wants someone to call her son, and she did nothing wrong.  Fontenot did not question Truelove about the alleged assault during the audio recording and Truelove did not discuss the alleged assault, except to say that her head hurt, and that:

> [Johnson] said don't fuck with him.  He said he would fuck with me.
> He said he would find me, that he would fuck with my husband—I
> don't have a husband—then he said I'll fuck with your fucking kids.
> So I want to go home.

Fontenot testified she recorded Truelove "[i]n case she said something that [Fontenot] would need to know for the investigation.  I wasn't going to question her about what happened at that time until at the time she was ready to talk, but in case a name or something came up that we needed to know for our investigation." Truelove did not identify her alleged assailant during the recording.

52

Johnson objected to admission of the audio recording based on Rule of Evidence 403, which precludes the admission of relevant evidence whose probative value is substantially outweighed by a danger of unfair prejudice. TEX. R. EVID. 403. In objecting to admission of the tape, Johnson's counsel stated:

> [T]his tape will not add any, or very little probative value to whether or not this offense occurred. It's basically being shown to the jury with hitting them over the head with how horrible this experience was for her. It doesn't prove that the experience actually occurred. It just proves that she's crying and screaming, and my concern is it's going to mislead the jury. It's going to appeal to their emotions without adding any factual evidence that's going to assist them in arriving at their decision, so I object to it's being admitted.

The State argued that the recording "captured Fontenot's initial interaction with Truelove. The recording captured Truelove being distraught after the assault, her immediate reaction to the assault . . . ."

In a Rule 403 analysis, the presumption is that the probative value of the challenged evidence outweighs the prejudicial effect. *Calvert v. State*, No. AP-77,063, 2019 WL 5057268, at *22 (Tex. Crim. App. Oct. 9, 2019) (not designated for publication); *see also Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) ("In keeping with the presumption of admissibility of relevant evidence, there is a presumption that relevant evidence is more probative than prejudicial."). Rule 403 "should be used sparingly to exclude relevant, otherwise admissible evidence that might bear on the credibility of either the defendant or complainant in such 'he said, she said' cases [involving sexual assault]." *Hammer v. State*, 296 S.W.3d 555,

562 (Tex. Crim. App. 2009)). In a Rule 403 analysis, "a reviewing court is to reverse the trial court's judgment 'rarely and only after a clear abuse of discretion.'" *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991)). Rule 403 only concerns "unfair" prejudice. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). "Evidence is unfairly prejudicial if it has the capacity to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged." *Id.*

In conducting a Rule 403 balancing test, the trial court must consider the following non-exclusive factors:

> (1) how probative the evidence is, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence.

*Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). The factors "may well blend together in practice." *Gigliobianco v. State*, 210 S.W.3d 637, 642 (Tex. Crim. App. 2006).

### 1. First Factor: Probative Value of the Evidence

For the first factor, the State argued that the audiotape

> clearly is probative to what happened that day, and after [] one of the witnesses testified and attacked the character of the victim, it became even more probative as to what actually transpired after that. . . . considering the charges in the indictment, the imminence of the threat and how she felt threatened, I think this helps corroborate that evidence . . . .

54

Johnson argued in the trial court that the tape is "inflammatory and there is no reason for it." He stated, "Given the witnesses that we've already heard, we know that she was hysterically crying and upset. . . . It doesn't prove that the experience actually occurred. It just proves that she's crying and screaming, and my concern is it's going to mislead the jury." He argued the tape would "appeal to their emotions without adding any factual evidence that's going to assist them in arriving at their decision." On appeal, Johnson argues the audiotape was not probative because during the recording, Truelove did not identify her alleged attacker, say that she was attacked, or explain why she was inconsolable.

Johnson premised his defense on Truelove's alleged untruthfulness. We therefore hold the audiotape recording was probative of Truelove's credibility and that Johnson opened the door with respect to admission of the recording by attacking Johnson's credibility.

This factor weighs in favor of admission. *See Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009) ("A party opens the door by leaving a false impression with the jury that invites the other side to respond.").

### 2.    Second Factor: Effect on the Jury

In examining the second factor, we consider the potential of the evidence to impress the jury in an irrational way. When the audiotape was admitted, the jury had already heard testimony from Truelove and four other witnesses, all of whom

55

testified that Truelove was upset immediately following the alleged assault.  Bishop testified that when she found Truelove, she "was sobbing, very—kind of hysterical." Officer Cunningham testified that when she first saw Truelove, *"she was crying, she was hysterical[.]"*  Pickens testified that when Truelove arrived at the hospital, "she was upset, she was anxious, she was crying."  Officer Jordan testified that when he arrived at Truelove's classroom, he saw that "[s]he was visibly upset.  She was crying."  And when Fontenot first encountered Truelove after the alleged assault, "she was crying, she was obviously upset and crying[.]"

In light of this testimony from five witnesses before the audiotape was played, it is unlikely the audiotape recording of Truelove crying "impress[ed] the jury in an irrational way."  This factor weighs in favor of admission.  *Cf. Martinez v. State*, No. 04-14-00652-CR, 2015 WL 6736781, at *5 (Tex. App.—San Antonio Nov. 4, 2015, pet. ref'd) (mem. op., not designated for publication) (stating in Rule 403 analysis that "[b]ecause L.B.'s testimony about the pornographic materials had already been presented before the jury, it is not likely that the introduction and admission of the actual materials in Martinez's possession would have impressed the jury in an unfairly prejudicial way").

### 3. Third Factor: Time to Develop Evidence

The audiotape was ten minutes long.  The trial lasted three days.  The reporters' record has one page reflecting Fontenot's testimony regarding the tape,

while the entire trial transcript is more than five hundred pages. Given the short amount of time needed to develop evidence of the audiotape, the third factor weighs in favor of the tape's admission. *See Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd) (holding testimony that occupied thirteen pages of 200-plus-page trial transcript weighed in favor of admission under Rule 403); *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (holding in Rule 403 analysis that extraneous-offense testimony that amounted to "less than one-fifth" of trial testimony was not excessive and weighed in favor of admission).

### 4. Fourth Factor: Need for the Evidence

The final factor considers the State's need for the evidence. In light of the testimony questioning Truelove's account of the assault and her truthfulness, we agree the State had some need for the evidence to bolster Truelove's testimony. But the State's need was tempered by the fact five State witnesses testified that Truelove was very upset after the alleged assault, and by the fact Truelove did not provide any details about the alleged assault during the recording other than stating:

> [Johnson] said don't fuck with him. He said he would fuck with me. He said he would find me, that he would fuck with my husband—I don't have a husband—then he said I'll fuck with your fucking kids. So I want to go home.

Truelove testified about the same statement earlier in the trial without objection from defense counsel. This factor weighs against admission. *See Gomez v. State*, No. 03-05-00730-CR, 2007 WL 3306495, at *12 (Tex. App.—Austin Nov. 9, 2007, pet.

ref'd) (mem. op., not designated for publication) (holding State's need for photos of track marks in defendant's arm weighed against admissibility under Rule 403 test "as there was already sufficient evidence in the record connecting [defendant] to the criminal activity").

We conclude the trial court reasonably could have concluded that the probative value of the audiotape was not substantially outweighed by the danger of unfair prejudice and that the trial court did not abuse its discretion in admitting the recording. *See* TEX. R. EVID. 403.

We overrule Johnson's fourth issue.

### Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).